IN THE UNITED STATES DISTRICT COURT FOR
THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | | |
|---|---|---|
| MARILYN NORRIS | ) | |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | CASE NO. 2:11-cv-051-MEF |
| | ) | (WO) |
| CITY OF MILLBROOK | ) | |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM OPINION AND ORDER**

Marilyn Norris ("Norris" or "Plaintiff") filed a one-count Amended Complaint (Doc. # 4) against her former employer, the City of Millbrook ("Defendant"), Alabama, alleging discriminatory employment practices in violation of the Age Discrimination in Employment Act of 1967 ("ADEA"), 29 U.S.C. § 621, *et seq.* The cause is before the court on Defendant's fully-briefed Motion for Summary Judgment. (Doc. # 15.) For the reasons set forth below, Defendant's motion is due to be **DENIED**.

**I. JURISDICTION AND VENUE**

Subject matter jurisdiction is exercised pursuant to 28 U.S.C. §§ 1331 (federal question), 1343 (civil rights), and 2201 and 2202 (declaratory relief). The parties do not contest personal jurisdiction or venue, and there are adequate allegations in support of both.

**II. STANDARD OF REVIEW**

"Summary judgment is appropriate if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter

of law." *Greenberg v. BellSouth Telecomms., Inc.*, 498 F.3d 1258, 1263 (11th Cir. 2007) (citation and internal quotation marks omitted); *see also* Fed. R. Civ. P. 56(a) ("The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." ).

"[A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986) (quotation omitted). The movant can meet this burden by presenting evidence showing there is no dispute of material fact, or by showing the non-moving party has failed to present evidence in support of some element of its case on which it bears the ultimate burden of proof. *Id.* at 322-23.

If the movant satisfies its evidentiary burden, the non-moving party must then establish, with evidence beyond the pleadings, that a genuine issue material to each of its claims for relief exists. *Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991); Fed. R. Civ. P. 56(c). What is material is determined by the substantive law applicable to the case. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986); *see also Lofton v. Sec'y of the Dep't of Children & Family Servs.*, 358 F.3d 804, 809 (11th Cir. 2004) ("Only factual disputes that are material under the substantive law governing the case will preclude entry of summary judgment."). Furthermore, "[t]he mere existence of some factual dispute will not defeat summary judgment unless that factual dispute is material to an issue affecting the

2

outcome of the case." *McCormick v. City of Ft. Lauderdale*, 333 F.3d 1234, 1243 (11th Cir. 2003) (citation and internal quotation marks omitted).

A genuine dispute as to a material fact can only be found "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248; *see also Greenberg*, 498 F.3d at 1263. However, if the evidence on which the nonmoving party relies "is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 242 (citations omitted). Likewise, "[a] mere scintilla of evidence in support of the nonmoving party will not suffice to overcome a motion for summary judgment[,]" *Young v. City of Palm Bay*, 358 F.3d 859, 860 (11th Cir. 2004), and the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). Furthermore, a nonmoving party's "conclusory allegations . . . in the absence of supporting evidence, are insufficient to withstand summary judgment." *Holifield v. Reno*, 115 F.3d 1555, 1564 n.6 (11th Cir. 1997); *see also Cordoba v. Dillard's, Inc.*, 419 F.3d 1169, 1181 (11th Cir. 2005) ("Speculation does not create a *genuine* issue of fact . . . .") (emphasis in original).

When a nonmovant fails to set forth specific facts supported by appropriate evidence sufficient to establish the existence of an element essential to his case and on which the nonmovant will bear the burden of proof at trial, summary judgment is due to be granted in favor of the moving party. *Celotex Corp.*, 477 U.S. at 323 ("[F]ailure of proof concerning

an essential element of the nonmoving party's case necessarily renders all other facts immaterial.").

On summary judgment, the facts must be viewed in the light most favorable to the non-movant. *See Lee v. Ferraro*, 284 F.3d 1188, 1190 (11th Cir. 2002). Hence, "'facts as accepted at the summary judgment stage of the proceedings, may not be the actual facts of the case.'" *Id.* (quoting *Priester v. City of Riviera Beach*, 208 F.3d 919, 925 n.3 (11th Cir. 2000)).

## III. BACKGROUND

The submitted evidence, construed in the light most favorable to Plaintiff, establishes the following facts.

Prior to the events that form the basis for this lawsuit, Plaintiff, who is in her mid-sixties (Norris Dep. 61 (Doc. # 15, Ex. 9)), had served several tours of full-time employment with the City of Millbrook at the Millbrook Police Department ("MPD"). Plaintiff's first employment with the City of Millbrook was from 1990 to mid-1992 as a dispatcher in the Communications Division of MPD. (Norris Dep. 61-63.) Plaintiff returned to the position full-time in 1996, and after leaving again, was reinstated in 1998 as a part-time dispatcher, but quit again later that year. (Norris Dep. 64-65.) In early-2003, Plaintiff was re-hired once again, this time employed as a police dispatcher. (Norris Dep. 67.) Plaintiff worked in this position until March 14, 2005, when she was transferred to the position of secretary to the Chief of Police (the "Chief's secretary"), who at that time was Kenneth Bradley. (Norris

4

Dep. 69.) Although she maintained the same benefits that she received in Dispatch, Plaintiff testified that she "considered [the Chief's secretary position] a promotion." (Norris Dep. 112-13.) The incumbent whom Plaintiff replaced as Chief's secretary was Ms. Melissa Stiles, who had resigned the position to pursue other employment opportunities. Plaintiff continued to work as the Chief's Secretary for the next six years. (Norris Dep. 71; Stiles Dep. 11-13 (Doc. # 15, Ex. 9).) In the meantime, Ms. Stiles had returned to MPD as a dispatcher shortly after resigning the Chief's secretary position, and was promoted to supervisor of Dispatch in the Communications Division in 2007 or 2008, where she stayed until May 24, 2010, when she replaced Plaintiff as the Chief's secretary. (Stiles Dep. 10, 14; Memorandum of Transfer (Def.'s Ex. 7).) Ms. Stiles is approximately 35 years old. (Stiles Dep. 6 (Doc. # 17, Ex. B).)

The circumstances surrounding Plaintiff's transfer out of and Ms. Stiles' accession to the Chief's secretary position are the subject of this lawsuit. Plaintiff claims that she was demoted because of her age. Defendants tell another story.

According to Plaintiff, she and Chief P.K. Johnson, who was appointed Chief in August 2008, shared a friendly relationship at the beginning of their co-tenure. Plaintiff was not able to identify a specific reason for the souring of their rapport, but testified that it began in early 2010. (Norris Dep. 143, 184, 211 ("His attitude changed . . . . I don't know what happened to [Chief Johnson]. He did a flip-flop.").) Plaintiff testified that Chief Johnson, beginning in 2010, "was always angry or hostile or mad about something, and there [were]

5

times that he never spoke to me . . . He only spoke to me when he had to." (Norris Dep. 184.) Plaintiff then recounted an incident where Chief Johnson was looking for some documents. Agitated and unable to find what he was looking for, Chief Johnson asked Plaintiff where the documents were. When she responded that she did not know, Chief Johnson retorted, "well, Grandma, if you don't know where they are, then . . . where are they?" (Norris Dep. 184-85.) Although Plaintiff testified that Chief Johnson had in the past referred to her in a matriarchal manner, she emphasized the derogatory "tone [in which] he said 'Grandma'" on this particular occasion. (Norris Dep. 185, 210.) Another usage Plaintiff viewed as disparaging occurred in front of a police sergeant in the officers' work room. The sergeant had some papers and attempted to hand them to Chief Johnson, who abruptly said, "don't give them to me . . . they are Grandma's." (Norris Dep. 186.)

According to Plaintiff, "[Chief Johnson] was a very disorganized person." (Norris Dep. 187.) As his secretary, she testified that made her job very difficult. (Norris Dep. 187.) Things, and papers in particular, were often misplaced. Plaintiff testified that when such an occasion manifested, "it usually followed that I needed Ginkgo B[i]loba to refresh my memory on what I had done with something . . . ." (Norris Dep. 186.) Plaintiff interpreted the Gingko Biloba comments from Chief Johnson as "belittling [her], more or less telling

6

[her] that because of her [age] . . . [she] needed stuff to help [her] memory."[1] (Norris Dep. 186.)

Around the time that Plaintiff's working relationship with Chief Johnson began to dissolve, Plaintiff noticed that Chief Johnson was spending a lot of time in Dispatch, where younger females, including Ms. Stiles worked. (Norris Dep. 178 ("Well, in dispatch you had all younger girls, and it was kind of like a [clique] . . . .").) Plaintiff testified that Chief Johnson "had more of a rapport with them than he did me. If [Chief Johnson] went outside to talk, it was like a covey of the little girls out there to talk with him . . . ." (Norris Dep. 179.) Chief Johnson's socializing with the younger females continued after-hours. Plaintiff testified that they would have parties or after-work dinners, and that Plaintiff was not invited. (Norris Dep. 98-99, 80.)

Plaintiff observed that Ms. Stiles shared an atypical working relationship with Chief Johnson, and that she received "preferential treatment" from Chief Johnson. (Norris Dep. 73.) For example, Plaintiff often noticed that "when [Chief Johnson] would come in to work, him and [Ms. Stiles] would hug and exchange little friendlies." (Norris Dep. 76.) Plaintiff "considered [Chief Johnson's] actions [with Ms. Stiles] inappropriate" and noted that it was

---

[1] Chief Johnson disputes Plaintiff's interpretation, stating that he merely "suggest[ed] the use of" memory loss vitamins. (Johnson Dep. 150 (Doc. # 15, Ex. 8); Stiles Dep. 32 (stating that Chief Johnson has "recommended taking memory loss vitamins" to her).)

not Chief Johnson's standard practice to greet any employee with hugs.[2] (Norris Dep. 80, 183.) Based on her observations, Plaintiff concluded that Chief Johnson was "emotionally attracted" to Ms. Stiles. (Norris Dep. 79.) Plaintiff also testified that Ms. Stiles' work attire was the subject of debate at the Millbrook Police Department. (Norris Dep. 131-35.) In Plaintiff's estimation, Ms. Stiles' ensembles – which included "short little outfits" and "revealing blouses" – were "inapppropriate" for the department. (Norris Dep. 131.)

Plaintiff's observations regarding Chief Johnson's working relationship with Ms. Stiles colored her perception of Ms. Stiles' highly irregular five-step pay increase that occurred towards the end of 2009.[3] (Norris Dep. 90-91; Stiles Dep. 29-30.) Plaintiff viewed the documents regarding Ms. Stiles's pay increase in the course of her duties as Chief's secretary, and "expressed [her] concern" to Chief Johnson that other people may have been "more deserving of [such a raise] than Ms. Stiles." (Norris Dep. 91.)

---

[2] Plaintiff also testified that she was told by an officer that he had witnessed Chief Johnson and Ms. Stiles engaged in inappropriate behavior at a party, which caused that officer and his wife to leave the party. (Norris Dep. 79.) "Evidence submitted in support of a summary judgment motion must be based on personal knowledge and must set out facts that would be admissible under the Federal Rules of Evidence." *Henderson v. FedEx Express*, No. 10-15633, 2011 WL 4600721, at *2 (11th Cir. Oct. 6, 2011) (citing Fed. R. Civ. P. 56(c)(4)). "[A] district court may consider a hearsay statement in passing on a motion for summary judgment if the statement could be 'reduced to admissible evidence at trial' or 'reduced to admissible form.'" *Macuba v. Deboer*, 193 F.3d 1316, 1323 (11th Cir. 1999). In this case, Plaintiff's deposition testimony reproducing what the officer attending the party allegedly witnessed and then related to Plaintiff lacks personal knowledge and is clearly hearsay offered to prove the truth of the matter asserted and falls under no hearsay exception within the Federal Rules of Evidence. It is therefore excluded and will not be considered at this stage.

[3] As to the exceptional nature of Ms. Stiles' five-step pay raise, Chief Johnson testified that generally "in the police department, if you get a good evaluation, you get a two-step raise[,]" and that "[a]nytime an employee receives anything other than a two-step raise, it has to be justified and documented . . . ." (Johnson Dep. 34, 59.) Although Ms. Stiles's pay raise proceeded through the proper channels, Chief Johnson testified that he could not recall any employee ever receiving over a five-step raise. (Johnson Dep. 159.)

8

Defendant's version of how Plaintiff handled the issue of Ms. Stiles's pay raise forms one example of Defendant's proffered legitimate nondiscriminatory reason for removing Plaintiff from the Chief's secretary position: her supposed "inability . . . to keep inter-office matters confidential [and] her continued interjection of herself into personnel matters that were not in the scope of her employment . . . ." (Def.'s Br. in Support 18.)

Regarding Ms. Stiles's five-step pay raise, Defendant argues that Plaintiff interjected herself into a personnel matter not within the scope of her employment by "[making known] her disapproval [of Ms. Stiles's pay raise] . . . to [Captain] Strickland." (May 21, 2010 Memo. (Doc. # 15, Ex. 4).)[4] Plaintiff disputes Defendant's characterization of Plaintiff's interaction with Captain Strickland concerning Ms. Stiles's pay raise. While Defendant's version of this incident suggests that Plaintiff went out of her way to make her disapproval known to Captain Strickland, Plaintiff's version, which the court must credit, suggests the opposite. According to Plaintiff, Captain Strickland – then-Lieutenant Strickland – came to her to inquire about supplemental pay for a certain K-9 officer. (Norris Dep. 103-04.) Plaintiff retrieved her chart, which listed "everybody's pay scale," and showed it to Captain Strickland. (Norris Dep. 104.) Out of "curiosity" and a desire to "calculat[e]" Ms. Stiles's pay rate after her five-step increase, Plaintiff had previously highlighted in yellow Ms. Stiles's pay scale on the chart then viewed by Captain Strickland. (Norris Dep. 104.) After

---

[4] Defendant's Brief in Support of summary judgment refers to the May 21, 2010 Memorandum from Assistant Chief Montgomery to Chief Johnson as containing Defendant's reasons for "transferring" Plaintiff. (Def.'s Br. in Support 18 ("Here, the City's reasons for transferring Plaintiff are articulated in the [May 21, 2010 Memorandum].").)

9

Captain Strickland inquired to Plaintiff about Ms. Stiles's pay rate and her highlighting of it, Plaintiff merely confirmed Ms. Stiles's new pay scale. She and Captain Strickland "both just made a little giggle or a shrug . . . and that was it." (Norris Dep. 105.)

The May 21, 2010 Memorandum also asserts that Plaintiff, during the same encounter with Captain Strickland, made negative comments about the K-9 officer's supplemental pay. (May 21, 2010 Memo.) Assistant Chief Montgomery, who drafted the May 21, 2010 Memorandum to Chief Johnson, testified that he only heard of the matter second-hand from Captain Strickland. (Montgomery Dep. 29 (Doc. #15, Ex. 11).) Plaintiff's version differs substantially from the version that appears in the May 21, 2010 Memorandum. Plaintiff testified that she merely stated to Captain Strickland that she "had not been advised of [the supplemental pay]" by Chief Johnson. (Norris Dep. 103-04.)

Defendant's Memorandum cites another incident regarding Plaintiff's interjection of herself into personnel matters. Prior to Captain Strickland's promotion to Captain, Plaintiff supposedly contacted Captain Strickland's wife and advised her that Captain Strickland was going to be promoted. (May 21, 2010 Memo.) Plaintiff, however, flatly denies that she did any such thing. (Norris Dep. 120.)

A fourth incident outlined in the May 21, 2010 Memorandum regards Plaintiff's criticism of a new officer's hire based upon Plaintiff's knowledge of his work history. (May 21, 2010 Memo.) As part of Plaintiff's duties as Chief's secretary, Plaintiff was entering the new officer – Officer Pitts – into a database. (Norris Dep. 122-23; Johnson Dep. 99.) In doing so, Plaintiff "noticed where one of the [law enforcement] employing agencies that he

10

had previously worked at had made an entry in his record that said 'not for rehire,' which means that agency would not hire him back." (Johnson Dep. 99.) According to Chief Johnson, Plaintiff "began making comments that we shouldn't have hired the officer." (Johnson Dep. 101.) Chief Johnson testified that Officer Pitts was nearby – possibly within earshot – and he advised Plaintiff to "be quiet." (Johnson Dep. 101.) Regarding the "not for rehire" tag on Officer Pitts, Chief Johnson testified that there was a "[s]trong possibility" that he was upset that he did not know that information prior to hiring Officer Pitts. (Johnson Dep. 102.)

Plaintiff testified that Chief Johnson had a different reaction to the news regarding Officer Pitts's work history. Instead of advising Plaintiff to quiet down, Plaintiff testified that Chief Johnson himself reacted loudly: "He stood up and he was mad. And he stormed out – he was storming out of my office, and he said, 'I'm fixing to tattoo some captains' asses.'" (Norris Dep. 202.) Chief Johnson "slammed the door" as he left. (Norris Dep. 202.) After breaching the subject with Chief Johnson, Plaintiff approached Captain Strickland – who was involved in the decision to hire Officer Pitts – and attempted to discuss the matter with him personally as she delivered some paperwork to his office. (Norris Dep. 125, 202-03.) Without mentioning Officer Pitts by name, Plaintiff commented to Captain Strickland that they "could have made a mistake hiring that guy . . . ." (Norris Dep. 122.) After she made the comment, she realized that another officer was present in Captain Strickland's office and apologized. (Norris Dep. 124-25, 204.)

11

Finally, Defendant's Memorandum states that "[Plaintiff] interjected herself in a situation" that involved the resignation of a crossing guard. (May 21, 2010 Memo.) Plaintiff disputes that she "interjected" herself, instead offering this narrative:

> "Well, [the crossing guard's] husband had told me she was quitting . . . because of Strickland. And he said she wants to talk to you, because at that time I was the one that uniformed them. I was the one that did their payroll and other stuff . . . And he said she wants to talk to you, and I said, well, tell her to call me.
> So she called me, and she informed me she was quitting. And at that time we were in dire need of crossing guards . . . And I asked her what was wrong, and she said because Strickland was rude to her over the main radio, and he was also rude to her at her post. And I said, well, let me see if I can get this straightened out . . . .
> In the meantime, I went to Captain Fields and told him what [the crossing guard] . . . had said and asked him . . . if we could maybe work this out. And that's when he informed me that [the crossing guard] was not in good grace with the police department . . . . And I said, well, she's turning in her resignation; do you want me to just tell her that we will honor her resignation? And he said, yes, ma'am, Ms. Marilyn, if you will . . . .
> And so I went right back and told [the crossing guard] . . . that we [would] honor [her] resignation. End of story.

(Norris Dep. 126-27.)

On account of these incidents, Defendant, acting through Chief Johnson as decisionmaker, notified Plaintiff on May 21, 2010[5] that she would be laterally transferred to the "Records and Communications Division as a records clerk. At times you will also be called upon to assist in communications and with special projects to be assigned on an as

---

[5] None of the incidents cited by Defendant as a reason for Plaintiff's "transfer" was documented in any way prior to May 13, 2010. In fact, Defendant's Personnel Policies Handbook states: "**IMPORTANT** Every case of disciplinary action will be fully documented by the supervisor or department head. Except for oral reprimands, a written report will be immediately forwarded to the Personnel Officer to be placed in the employee's permanent personnel file." (Personnel Policies 7-31 (Doc. # 17, Ex. I) (emphasis in original).)

12

needed basis." (Transfer of Duties Letter (Doc. # 15, Ex. 6).) Chief Johnson replaced Plaintiff with Ms. Stiles. (All Personnel Letter (Doc. # 15, Ex. 7).)

From the date of her transfer to the date of her resignation on January 12, 2011, Plaintiff was never called upon to assist in any special project. (Norris Dep. 166; Montgomery Dep. 63-65.) In fact, Plaintiff testified that her duties were "reduced to almost zero" and that she was moved to an unoccupied small desk in the corner of the records office that did not have a telephone or a computer. (Norris Dep. 109-10, 157-58.) Plaintiff further testified that she felt "degraded" by the ouster and felt that she became an office pariah post-"transfer." (Norris Dep. 27, 34.)

## IV. DISCUSSION

The ADEA makes it unlawful for an employer "to discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age." 29 U.S.C. § 623(a)(1). At the summary judgment stage, the court applies the burden-shifting framework established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), to analyze an ADEA claim based on circumstantial evidence of discrimination.[6] *See Chapman v. AI Transp.*, 229 F.3d 1012, 1024 (11th Cir. 2000); *see also Horn v. United Parcel Servs., Inc.*, No. 10-13915, 2011 WL 2650858, at *4 (11th Cir. July 7, 2011) (continuing to apply

---

[6] Although there is evidence that the decisionmaker, Chief Johnson, referred to Plaintiff as "Grandma" and suggested the use of Ginkgo Biloba, Plaintiff does not argue that this is a direct evidence case. (Pl.'s Resp. Br. 16 (Doc. # 17).)

13

Case 2:11-cv-00051-MEF-CSC   Document 23   Filed 11/15/11   Page 14 of 20

*McDonnell Douglas* framework to summary judgment analysis of an ADEA claim after the Supreme Court's decision in *Gross v. FBL Fin. Servs., Inc.*, 129 S. Ct. 2343 (2009)). Under the *McDonnell Douglas* framework, a plaintiff must first establish a *prima facie* case of age discrimination by showing that: (1) she was a member of the protected group of persons between the ages of 40 and 70; (2) she was subject to an adverse employment action; (3) she was qualified to do the job; and (4) she was replaced by a younger individual. *Chapman*, 229 F.3d at 1024.

"If a plaintiff establishes a *prima facie* case of discrimination, the defendant employer must articulate a legitimate, nondiscriminatory reason for the challenged employment action." *Id.* In *Chapman*, the Eleventh Circuit described the employer's burden as "merely one of production[.]" *Id.* In other words, the employer "'need not persuade the court that it was actually motivated by the proffered reasons. It is sufficient if the defendant's evidence raises a genuine issue of fact as to whether it discriminated against the plaintiff.'" *Id.* (quoting *Combs v. Plantation Patterns*, 106 F.3d 1519, 1528 (11th Cir. 1997)).

If the defendant employer articulates one or more legitimate and nondiscriminatory reasons for the challenged action, "the presumption of discrimination is eliminated and 'the plaintiff has the opportunity to come forward with evidence, including the previously produced evidence establishing the *prima facie* case, sufficient to permit a reasonable factfinder to conclude that the reasons given by the employer were not the real reasons for the adverse employment decision.'" *Chapman*, 229 F.3d at 1024 (quoting *Combs*, 106 F.3d at 1528). However, if the plaintiff does not produce sufficient evidence "to create a genuine

14

issue of material fact regarding whether each of the defendant employer's articulated reasons is pretextual, the employer is entitled to summary judgment on the plaintiff's claim." *Id.* at 1025 (citing *Combs*, 106 F.3d at 1529).

The ultimate burden of proof for an ADEA plaintiff was the subject of the Supreme Court's opinion in *Gross*. There, "the Supreme Court ruled out the idea of a 'mixed motive' ADEA claim, instead requiring plaintiffs to show that age was the 'but for' cause of an employment action." *Mora v. Jackson Mem'l Found., Inc.*, 597 F.3d 1201, 1204 (11th Cir. 2010). In other words, *Gross* requires "that 'age [be] the reason that the employer decided to act.'" *Id.* (quoting *Gross*, 129 S. Ct. at 2350).

With Plaintiff's burden of proof in mind, *see Mora*, 597 F.3d at 1204 (analyzing post-*Gross* motion for summary judgment "in accord with the 'ordinary default rule that plaintiffs bear the risk of failing to prove their claims'" (quoting *Gross*, 129 S. Ct. at 2351)), the Court proceeds to address Plaintiff's circumstantial evidence ADEA claim under the *McDonnell Douglas* framework.

### A.   **Plaintiff's *Prima Facie* Case**

Defendant does not dispute three of the four elements of Plaintiff's *prima facie* case. (Def.'s Br. in Support 14.) Plaintiff is within the protected class and was replaced by Ms. Stiles, who is not within the protected class. Moreover, Defendant does not argue that Plaintiff was not qualified to be the Chief's secretary, and the evidence suggests that Plaintiff's job performance in her six years as Chief's secretary was roundly positive. Even in the May 21, 2010 Memorandum which formed the basis for Plaintiff's "transfer,"

Assistant Chief Montgomery wrote that Plaintiff "is a good employee . . . ." (May 21, 2010 Memoradum) Moreover, Plaintiff's performance evaluations from 2006 to 2009 were wholly complimentary. (Perf. Evals. (Doc. # 17, Ex. G).)

Defendant argues instead that Plaintiff's *prima facie* case fails because she was not subject to an adverse employment action. Although Plaintiff was forced out of the Chief's secretary position, Defendant argues that moving her to records clerk constituted a "lateral transfer" and not a "demotion." (Def.'s Br. in Support 16-17.) The Eleventh Circuit has adopted an objective test of determining whether an employment action is adverse enough to be cognizable under federal anti-discrimination statutes. *See Doe v. Dekalb Cnty. Sch. Dist.*, 145 F.3d 1441, 1448-49 (11th Cir. 1998) (ADA); *Hinson v. Clinch Cnty., Ga. Bd. of Educ.*, 231 F.3d 821, 828-29 (11th Cir. 2000) (Title VII); *see also Bonham v. Regions Mortg., Inc.*, 129 F. Supp. 2d 1315, 1329 (M.D. Ala. 2001) (ADEA). In other words, "[a]n [ADEA] plaintiff must demonstrate that a reasonable person in his position would view the employment action in question as adverse." *Doe*, 145 F.3d at 1449.

Defendant argues that Plaintiff's reassignment was a "lateral transfer" and not a "demotion" because Plaintiff retained the same compensation and benefits. (Def.'s Br. in Support 17-18.) Furthermore, Defendant avers that "any 'prestige' [Plaintiff] associated with the position of [Chief's secretary] was not objective, but [subjective]." (Def.'s Br. in Support 18.)

Defendant places too much focus on the fact that Plaintiff's remuneration remained unaltered. The Eleventh Circuit has held that "[t]ransfers that result in lesser pay,

16

responsibilities, *or* prestige [are] 'adverse.'" *Doe*, 145 F.3d at 1452 (collecting cases) (emphasis added). Although Plaintiff does not dispute that there was no abatement in her pay or her benefits, she testified that her responsibilities "were reduced to almost zero" and that she was not supplied "any [necessary] equipment" and that she was a departmental outcast after the move. (Norris Dep. 34, 110.) Furthermore, the last paragraph of Chief Johnson's Transfer of Duties Letter Plaintiff reads: "There will be no official reason given for this change in your duty assignment. I have no desire for your transfer to be a source of embarrassment for you or a topic of discussion (departmental gossip)." (Transfer of Duties Letter (Doc. # 15, Ex. 6).) This language suggests an attempt by Chief Johnson to mitigate the blow of what is in reality a demotion by calling it something else. (Johnson Dep. 138 ("I knew there would be speculation . . . .").) Plaintiff's ouster from the Chief's secretary position to records clerk was not an "apples and apples" transfer. *Njie v. Regions Bank*, 198 F. App'x 878, 883 (11th Cir. 2006) (finding no adverse employment action where the plaintiff was transferred to a different office but "retained the same duties and responsibilities" as well as the same salary and benefits). On this record, Plaintiff's "transfer" to a position carrying little responsibility in a previously uninhabited and forgotten corner of MPD's Records office – without a phone or computer – resembles a forced exile more than a lateral transfer. Such a move clearly constitutes an adverse employment action under the Eleventh Circuit's objective test. *See Doe*, 145 F.3d at 1448-49.

**B.      Defendant's Legitimate Nondiscriminatory Reason and Plaintiff's Showing of Pretext**

Having stated a *prima facie* case of age discrimination, "the defendant employer must articulate a legitimate, nondiscriminatory reason for the challenged employment action." *Chapman*, 229 F.3d at 1024.  As recounted above, Defendant cites Plaintiff's supposed indiscretion regarding personnel matters, and refers generally to Assistant Chief Montgomery's May 21, 2010 Memorandum to Chief Johnson.  Having satisfied its burden of production of a legitimate nondiscriminatory reason for the demotion, the burden returns to Plaintiff to present evidence "sufficient to permit a reasonable factfinder to conclude that the reasons given by the employer were not the real reasons for the adverse employment decision." *Id.* (internal quotations and citations omitted).  As set forth below, Plaintiff has carried this burden.

Regarding the five incidents outlined in the May 21, 2010 Memorandum, Plaintiff either flatly denies that the incidents happened or tells a very different and harmless story, *supra* at 9-12.  Whether these incidents occurred or how they occurred constitute issues of material fact, and Plaintiff's substantially contradistinctive stories as to each incident forms genuine disputes as to these issues of material fact.  *See  Shook v. St. Bede Sch.*, 74 F. Supp. 2d 1172, 1179 (M.D. Ala. 1999) ("By offering alternative interpretations of the [defendants'] specific examples, [the plaintiff] has therefore underscored the doubt he has already raised about the purely subjective nondiscriminatory reasons . . . ."); *see also Skelly v. Okaloosa Cnty. Bd. of Cnty. Comm'rs*, 415 F. App'x 153, 155 (11th Cir. 2011) (stating that in "the

classic case of the plaintiff swearing to one set of facts and the defendant[ ] swearing to another set of facts . . . the district court [is] required [at summary judgment] to credit [the plaintiff's] testimony of what happened").

Furthermore, Plaintiff points out that Defendant's documentation regarding her demotion is potentially suspect. All of the negative performance memoranda regarding Plaintiff was created on or after May 13, 2010, a mere eight days prior to the adverse employment action.[7] The lack of documentation at the time of the supposed incidents of misconduct indicates, at the very least, that Defendant failed to follow its own misconduct procedures. *See Young v. Dillon Cos., Inc.*, 468 F.3d 1243, 1252 (10th Cir. 2006) (stating that "evidence suggesting, *inter alia*, that the defendant fabricated documentation relating to the [adverse employment action] and failed to follow its own written . . . procedures" is relevant to plaintiff's showing of pretext). While the timing of such documentation "does not lead to the automatic conclusion" that Plaintiff's demotion was because of her age, it does support an "'inference' that Defendant might be 'cover[ing] up a discriminatory purpose.'" *Ashe v. Aronov Homes, Inc.*, 354 F. Supp. 2d 1251, 1261 (M.D. Ala. 2004) (quoting *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 147 (2000)).

Likewise, a reasonable juror could conclude that Chief Johnson's words and actions in the months leading up to Plaintiff's demotion support an inference of age-related discrimination. Plaintiff's testimony regarding Chief Johnson's special treatment of the

---

[7] One of these documents is undated. (Doc. # 15, Ex. 3.)

younger women in Dispatch, and of Ms. Stiles in particular, to whom Chief Johnson awarded an unprecedented five-step pay raise and later Plaintiff's job, may support a reasonable juror's conclusion that Chief Johnson demoted Plaintiff so as to replace her with a younger female to whom he was "attracted." (Norris Dep. 79, 178-79.) This, in combination with Chief Johnson's allegedly derogatory use of the term "Grandma" on multiple occasions, could lead a reasonable juror to view these incidents as constituting more than "stray remark[s][,]" *see Calder v. TCI Cablevision of Mo., Inc.*, 298 F.3d 723, 730 (8th Cir. 2002).

Plaintiff has provided sufficient evidence of pretext to allow a reasonable juror to conclude that Defendant's articulated legitimate nondiscriminatory reason for its demotion of Plaintiff was not its actual reason. Summary judgment is due to be denied.

## V.  CONCLUSION

Accordingly, it is ORDERED that Defendant's Motion for Summary Judgment (Doc. # 15) is DENIED.

DONE this 15th day of November, 2011.

/s/ Mark E. Fuller
UNITED STATES DISTRICT JUDGE